UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JENNIFER DELUCA, *et al.*,

Plaintiffs,

v.

KERN COUNTY SHERIFF'S OFFICE, *et al.*,

Defendants.

Case No. 1:24-cv-01524-CDB

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

(Docs. 39, 45, 47, 54)

**21-Day Deadline**

Pending before the Court[1] are the motions of Defendants County of Kern, Kern County Sheriff's Office ("KCSO"), Donny Youngblood, Frances Amparo, John Comparan, Myra Gonzalez, Sarah Jimenez-Puente, Rigoberto Lucio, Erik Medina, Coleen Najac, Laura Rojas, and Justin Weigand (collectively, "County Defendants") to dismiss claims asserted in the operative first amended complaint. (Docs. 39, 45, 54). Also before the Court is the motion to dismiss of Defendants Kern County Hospital Authority ("KCHA") and Kenya Gooden (collectively, "Hospital Defendants"). (Doc. 47).

Plaintiff Jennifer DeLuca, and minor Plaintiffs M. D. and G. D. (through guardian ad litem Anthony DeLuca) (collectively, "Plaintiffs"), filed oppositions to the motions to dismiss (Docs. 42,

[1] Following all parties' expression of consent to the jurisdiction of a magistrate judge for all further proceedings in this action, including trial and entry of judgment, on May 12, 2025, this action was reassigned to the undersigned pursuant to 28 U.S.C. § 636(c)(1). (Doc. 27).

48, 49, 55), and County Defendants filed replies (Docs. 44, 50, 56); Hospital Defendants did not file a reply.

**I. Background**

On December 12, 2024, Plaintiffs initiated this action with the filing of a complaint. (Doc. 1). Plaintiffs filed the operative first amended complaint ("FAC") on November 18, 2025. (Doc. 31).

In the FAC, Plaintiffs allege that, on October 22, 2023, Plaintiff Jennifer DeLuca was "experiencing a mental health crisis which prompted her family to contact the [KCSO] for assistance." (Doc. 31 ¶ 40). KCSO deputies Morales, Ortega, and Sanchez responded to the call for service at approximately 2:59 p.m. at Ms. DeLuca's residence. "Upon information and belief, Ms. De Luca's family was informed that she would receive the mental health care she urgently needed[.]" The deputies "placed Ms. DeLuca in handcuffs and transported her to the Kern County Justice Receiving Facility" and she was "later booked into the Lerdo Pre-Trial Facility, located at 17695 Industrial Farm Road, Bakersfield, CA 93308." *Id.* ¶ 41.

Paramedics arrived on the scene to evaluate Ms. DeLuca at approximately 3:08 p.m., "including to take her vitals but deputies declined." The paramedics advised that Ms. DeLuca would "likely be rejected from booking because of visible injuries and blood in her mouth" and "Deputy Ortega requested that paramedics 'clean her up' with salt water rather than provide a medical evaluation"; Ms. DeLuca's "vitals were never taken." *Id.* ¶ 42. Ms. DeLuca was "rejected from booking" at the Kern County Justice Receiving Facility due to her visible injuries. Unnamed deputies then "transported her to Kern Medical for routine clearance only to return her to Lerdo Pre-Trial Facility [] later that same evening." *Id.* ¶ 43.

That same day, Defendant Kenya Gooden, a registered nurse, "documented that Ms. DeLuca presented with facial swelling and referred her to County Mental Health for 'ADHD and unknown psychiatric disorders.'" *Id.* ¶ 44. "KCSO custody staff, medical staff and mental health staff were aware that Ms. DeLuca had a history of serious mental health issues including prior suicide attempts and multiple psychiatric hospitalizations that placed her at an increased risk of suicide," and "competent custody staff and/or mental health staff should have considered Ms.

DeLuca's underlying arrest charges to be a red flag," as well as "noted the arrest as a significant problem with impulse control, which too is associated with elevated suicide risk." *Id.* ¶ 45.

Five months prior, Ms. DeLuca was arrested and transported to jails in Kern County. During this detainment, she was "placed on suicide watch after correctional staff determined she was a danger to herself due to engaging in self-harming behavior." She was then placed on a "psychiatric hold pursuant to WIC § 5150[2]." While she was hospitalized, she reported "auditory hallucinations (command-type) that told her to 'take her life'" and she reported "experiencing visual hallucinations of 'hell' and paranoia." *Id.* ¶ 46.

On October 22, 2023, after being medically cleared. Ms. DeLuca was transported by Defendant Deputy Comparan to the Lerdo Pre-Trial Facility "while she cried uncontrollably and told [Comparan], 'Please, please, please shoot me.'" Ms. DeLuca "proceeded to bang her head on the interior of the patrol vehicle." Defendant Comparan "failed to summon medical or mental health assistance and proceed to book her into custody," despite her "obvious psychiatric distress and clear suicidal ideation." *Id.* ¶ 47 (emphasis omitted). Classification Deputy Defendant Rojas processed Ms. DeLuca at intake in the Lerdo Pre-Trial Facility. Ms. DeLuca was "housed by [Defendant Rojas] in the general population without any designation regarding [her] medical condition that would alert those in charge of her care that she required" monitoring and follow-up treatment, despite Ms. DeLuca reporting a "history of ADHD and other mental health issues." *Id.* ¶ 48.

On October 23, 2023, Defendant Najac "evaluated Ms. DeLuca and documented that she presented with a swollen jaw and reported pain to her back, hip, and neck from an altercation prior to her arrest." Defendant Najac noted that Ms. DeLuca "had 'extensive mental health challenges' and was 'not able to advocate for herself.'" *Id.* ¶ 49. On October 24, 2023, an unnamed "Doe" Defendant, at the direction of Defendant Jimenez-Puente (a licensed clinical social worker), conducted a "suicide-risk screening and noted Ms. DeLuca's hopelessness, withdrawn affect, stiffness, and poor eye contact but nevertheless reported she was not an imminent risk of suicide." *Id.* ¶ 50.

[2] Presumably, California Welfare and Institutions Code § 5150.

Ms. DeLuca "continued to refuse court appearances and displayed erratic behavior, including on October 26, 2023, when she told Defendant Deputy [Amparo] she was too unwell to attend court. Upon information and belief," she was "never referred to a psychiatrist for further evaluation or treatment during her incarceration." *Id.* ¶ 51. On October 27, 2023, while housed in B-Pod Unit 4, Ms. DeLuca "ran out of the shower, located on the second floor of her housing unit, while nude and jumped over the second-story railing, falling approximately [12] feet onto the concrete floor." Defendant Gonzalez, the assigned floor deputy for Ms. DeLuca's housing unit, "subsequently entered the dayroom, broadcasted a medical emergency, and called for assistance." Defendant Amparo, as well as Defendants Sergeant Lucio and Lieutenant Weigand, "responded to the scene." *Id.* ¶ 52.

"As a result [of] her suicide attempt, Ms. DeLuca suffered severe traumatic brain and spinal injuries, leaving her permanently disabled." *Id.* ¶ 53. Shortly thereafter, Defendant Senior Deputy Medina was "assigned to investigate the facts and circumstances surrounding Ms. DeLuca's attempted suicide" and "conducted an investigation that served to shield" many of the other Defendants. Defendant Medina "failed to properly investigate" the attempted suicide by "omitting material facts provided to him during inmate witness interviews," conducted "cursory and superficial interviews" of key witnesses, and "manufactured witness recollection." *Id.* ¶ 54.

Regarding the claims of municipal liability, Plaintiffs allege generally that Defendants County of Kern and KCSO engage in "patterns and practices of not conducting proper and timely Title 15 welfare and safety checks." *Id.* ¶ 56. Plaintiffs assert that in 2023 there were 11 in-custody deaths, including five from natural causes and six suicides, within KCSO jails. *Id.* ¶ 63. Plaintiffs further allege that, from January 2008 to December 2023, 22 inmates have died by suicide in jails within the County of Kern. *Id.* ¶ 64. Plaintiffs' FAC provides factual background for 11 deaths within County facilities. *See id.* ¶¶ 65-75.

## II. <u>Governing Authority</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a plaintiff's complaint for failing "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *N. Star*

*Int'l v. Ariz. Corp. Comm'n.*, 720 F.2d 578, 581 (9th Cir. 1983) (citing *Peck v. Hoff*, 660 F.2d 371, 374 (8th Cir. 1981)). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* Fed. R. Civ. P. 8(a)(2) (a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief). A complaint satisfies the plausibility requirement if it contains sufficient facts for the court to "draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept as true all allegations put forth in the complaint and construe all facts and inferences in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Hebbe v. Pliler*, 627 F.3d 338, 340 (9th Cir. 2010). The complaint need not include "detailed factual allegations," but must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citations omitted). And "even 'well-pleaded facts' are not sufficient if they are accompanied by only '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Gibson v. City of Portland*, 165 F.4th 1265, 1287 (9th Cir. 2026) (quoting *Iqbal*, 556 U.S. at 678) (alterations in original). The Court is "not 'required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'" *Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (quoting *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)).

**III. <u>Discussion</u>**

In the operative complaint, Plaintiffs assert the following claims under 42 U.S.C. § 1983

against Defendants:[3] (1) failure to protect from harm (against Defendants Amparo, Comparan, Gonzalez, Gooden, Jimenez-Puente, Najac, Rojas, and AMFT/APCC "Doe"); (2) failure to provide medical care (against Defendants Amparo, Comparan, Gonzalez, Gooden, Jimenez-Puente, Najac, Rojas, and AMFT/APCC "Doe"); (3) deprivation of the Plaintiffs' right to familial relationship (against Defendants Amparo, Comparan, Gonzalez, Gooden, Jimenez-Puente, Najac, Rojas, and AMFT/APCC "Doe"); (4) *Monell* violations (against County of Kern, KCSO, and KCHA); and (5) supervisory liability (against Defendants Youngblood, Lucio, Medina, and Weigand). *See* (Doc. 31 at 25-48). Plaintiffs also assert the following state law claims: (6) negligence – wrongful death (against all County Defendants); (7) Cal. Gov. Code § 845.6 (against all County Defendants); (8) Cal. Civ. Code § 52.1 (against all County Defendants); (9) dangerous condition on public property and premises liability (against all Defendants); and (10) declaratory relief (against all Defendants). *See id.* at 48-56.

**A. Federal Claims Against Individual Defendants**

***i. Legal Standard***

To state a claim under section 1983, a plaintiff is required to show that (1) each defendant acted under color of state law and (2) each defendant deprived him of rights secured by the Constitution or federal law. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (citing *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *West v. Atkins*, 487 U.S. 42, 48 (1988)). This requires the plaintiff to demonstrate that each defendant personally participated in the deprivation of his rights. *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009); *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007).

The Fourteenth Amendment protects the rights of pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (noting that pretrial detainees' "rights arise under the Fourteenth Amendment's Due Process Clause"). Relevant here, the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim

[3] When referring to causes of action in the operative complaint by number, the Court shall use the numbering set forth herein.

against an individual defendant are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn[] on the facts and circumstances of each particular case.

*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (alteration in original; footnote, citation, and internal quotation marks omitted); *see Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

The Supreme Court has explained that there is "no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement.' Indeed, the medical care a prisoner receives is just as much a 'condition' of his confinement as ... the protection he is afforded against other inmates." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *see Gordon*, 888 F.3d at 1124 ("we have long analyzed claims that government officials failed to address pretrial detainees' medical needs using the same standard as cases alleging that officials failed to protect pretrial detainees in some other way").

Thus, to bring a pretrial detainee's failure to protect or inadequate medical care claim under the Fourteenth Amendment, a plaintiff must establish the same four factors as noted above. *Gordon*, 888 F.3d at 1125; *Castro*, 833 F.3d at 1071. In contrast to the knowing and purposeful state of mind in the first element, the remaining elements are subject to an objective standard. *See Castro*, 833 F.3d at 1070-71. As noted *supra*, the third element must be viewed on each case's particular facts and circumstances, and the plaintiff must prove the defendant acted with "more than negligence but less than subjective intent – something akin to reckless disregard." *Sandoval*, 985 F.3d at 669 (quoting *Castro*, 833 F.3d at 1071).

The Fourteenth Amendment also protects liberty interests in the companionship between parents and children. "Parents and children may assert Fourteenth Amendment substantive due

process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dep't. of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). "Only official conduct that shocks the conscience is cognizable as a due process violation … A prison official's deliberately indifferent conduct will generally 'shock the conscience' so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Id.* (citations and quotations omitted).

***ii. Analysis – First and Second Causes of Action***

The same legal standard governs Plaintiffs' first and second causes of action (failure to protect and failure to provide medical care, respectively).

As a preliminary matter, Plaintiffs include in the first cause of action allegations against Defendants County of Kern, KCSO, Youngblood, Lucio, and Weigand relating to municipal and supervisorial liability claims, even though those Defendants are not named in the caption of either cause of action. Plaintiffs do not include allegations against these Defendants in the first (or second) cause of action that arise out of their individual actions toward Ms. DeLuca and, thus, the Court will proceed to analyze such claims under municipal and supervisorial liability *infra*. *See* (Doc. 31 at 27-28).

Plaintiffs allege that Defendants Amparo, Comparan, Gonzalez, Gooden, Jimenez-Puente, Najac, and Rojas kept Ms. DeLuca in custody despite "such conditions [putting her] at substantial risk of suffering serious harm," "did not take any reasonable available measures to abate or reduce the risks [Ms. DeLuca] faced," had sufficient means to take protective measures, and "deliberately disregarded the hazards and risks posed to persons incarcerated at the [Lerdo Pre-Trial Facility]." (Doc. 31 ¶¶ 88-91).

Before analyzing the allegations against the individual Defendants in turn, the Court notes Plaintiffs' prefatory allegation that, five months prior to the detainment at issue, Ms. DeLuca was arrested and transported to jails in Kern County. During this detainment, she was "placed on suicide watch after correctional staff determined she was a danger to herself due to engaging in self-harming behavior." She was then placed on a "psychiatric hold pursuant to WIC § 5150." While she was hospitalized, she reported "auditory hallucinations (command-type) that told her to 'take

her life'" and she reported "experiencing visual hallucinations of 'hell' and paranoia." *Id.* ¶ 46. However, Plaintiffs do not connect this event with any of the individual Defendants. Plaintiffs do not allege, for instance, that any of the individual Defendants interacted with Ms. DeLuca during this prior detainment, or that they were informed of said detainment and resulting concerns and failed to take action despite this, or that they should have been aware of the circumstances of the prior detainment by virtue of facility records and disregarded said facts in an unconstitutional manner. Thus, these allegations do not materially sustain Plaintiffs' claims because they provide only that unidentified KCSO staff "were aware" of a history of serious mental health issues, but do not set forth how any named Defendant knew or should have known of this history.

1. <u>Defendants Amparo and Gonzalez</u>

Plaintiffs allege that Defendants Amparo and Gonzalez were corrections deputies for the KCSO, assigned to work as a floor deputies on October 27, 2023, and were responsible for carrying out KCSO policies and procedures and ensuring inmate safety. (Doc. 31 ¶¶ 21-22).

Plaintiffs allege that Ms. DeLuca refused court appearances and "displayed erratic behavior, including on October 26, 2023, when she told Defendant Deputy [Amparo] she was too unwell to attend court. Upon information and belief," she was "never referred to a psychiatrist for further evaluation or treatment during her incarceration." *Id.* ¶ 51. On October 27, 2023, while housed in B-Pod Unit 4, Ms. DeLuca "ran out of the shower, located on the second floor of her housing unit, while nude and jumped over the second-story railing, falling approximately [12] feet onto the concrete floor." Defendant Gonzalez, the assigned floor deputy for Ms. DeLuca's housing unit, "subsequently entered the dayroom, broadcasted a medical emergency, and called for assistance." Defendant Amparo, as well as Defendants Lucio and Weigand, "responded to the scene." *Id.* ¶ 52.

Plaintiffs do not allege in the operative complaint that either Defendants Amparo or Gonzalez had been informed or otherwise had reason to know Ms. DeLuca necessarily was at a heightened risk of harm. In short, to sustain claims such as those Plaintiffs advance here that custodial staff violated an inmate's constitutional rights, they must allege facts "from which it could be plausibly inferred that a reasonable officer 'would have appreciated' the 'high degree' of suicide risk that [the inmate] presented at the time of" the defendant's actions." *Hernandez v. Cnty.*

*of Santa Clara*, No. 19-cv-07888-EJD, 2020 WL 3101041, at *4 (N.D. Cal. June 11, 2020) (quoting *Gordon*, 888 F.3d at 1125).

Plaintiffs plead only that Defendant Amparo was informed that, the day before the suicide attempt, Ms. DeLuca was too unwell to attend court and that, immediately after the attempt, Defendant Gonzalez broadcasted a medical emergency and called for assistance, to which Amparo and other Defendants responded. Plaintiffs do not provide that, for instance, Ms. DeLuca informed Amparo she could not attend court due to suicidal ideation, nor that some other indication, such as any specific erratic behavior, should have made Amparo aware of a heightened risk of suicide. Plaintiffs allege only that Amparo was informed that Ms. DeLuca was generally "unwell" and do not advance any facts as to whether Amparo was made aware of the ailment in detail sufficient to implicate a heightened risk of harm. Plaintiffs allege no facts setting forth that either Amparo or Gonzalez knew of a heightened risk and exhibited "reckless disregard" of that risk or that would permit the drawing of a reasonable inference of such. *Cf. NeSmith v. Olsen*, 808 F. App'x 442, 445 (9th Cir. 2020) (noting that where deputies observed a rope hanging from the decedent's light on the night before his suicide, "the rope presented a clear warning that [decedent] presented an imminent suicide risk. Every reasonable official would [have understood] that failing to recognize that risk violated [decedent's] rights.") (citations and quotations omitted).

2. Defendant Rojas

Plaintiffs allege that, at the time of the events at issue, Defendant Rojas was a classifications officer for KCSO and was tasked with carrying out KCSO policies and procedures and for ensuring inmate safety by way of proper housing and classification. *Id.* ¶ 24. Plaintiffs assert that Defendant Rojas processed Ms. DeLuca at intake in the Lerdo Pre-Trial Facility. Ms. DeLuca was "housed by [Defendant Rojas] in the general population without any designation regarding [her] medical condition that would alert those in charge of her care that she required" monitoring and follow-up treatment, despite Ms. DeLuca reporting a "history of ADHD and other mental health issues." *Id.* ¶ 48.

Plaintiffs do not plead sufficient facts to permit the drawing of any reasonable inference that Defendant Rojas was aware of Ms. DeLuca's heightened risk of suicide or suicidal ideations.

Plaintiffs do not allege that, for instance, Ms. DeLuca disclosed to Defendant Rojas any facts suggesting a heightened risk of suicide or self-harm. And Plaintiffs do not allege Defendant Rojas conducted an improper or deficient interview with Ms. DeLuca. Instead, Plaintiffs allege in a conclusory fashion that "KCSO custody staff, medical staff and mental health staff were aware that Ms. DeLuca had a history of serious mental health issues including prior suicide attempts and multiple psychiatric hospitalizations that placed her at an increased risk of suicide," and "competent custody staff and/or mental health staff should have considered Ms. DeLuca's underlying arrest charges to be a red flag," as well as "noted the arrest as a significant problem with impulse control, which too is associated with elevated suicide risk." *Id.* ¶ 45.

This is insufficient to survive a Rule 12(b)(6) motion. Plaintiffs do not plead facts as to how Defendant Rojas was aware of this increased risk of suicide. Plaintiffs allege that Ms. DeLuca was arrested and transported to jails in Kern County five months prior to her arrest on October 22, 2023, was then placed on a psychiatric hold, and reported hallucinations while hospitalized directing her to take her own life. *Id.* ¶ 46. But Plaintiffs do not advance facts identifying to whom she reported these hallucinations, whether Defendant Rojas knew of or should have known of these reports, and whether they informed Ms. DeLuca's later detainment despite predating it by five months. Additionally, Plaintiffs set forth that Ms. DeLuca's initial arrest on October 22, 2023, was due to her "experiencing a mental health crisis" and that Defendant Gooden referred her to County Mental Health for "ADHD and unknown psychiatric disorders." *Id.* ¶¶ 41, 44. Plaintiffs do not set forth what information regarding her arrest or referral should have indicated to Defendant Rojas of a heightened risk of suicide.

Thus, Plaintiffs fail to adequately plead that Defendant Rojas did not take reasonable available measures to abate substantial risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved and making the consequences of Defendant Rojas' conduct obvious. *See, e.g.*, *Hernandez*, 2020 WL 3101041, at *4 (N.D. Cal. June 11, 2020) ("As to the initial intake decision, Plaintiff alleges that Aguilar had suicidal ideations. Assuming, as the Court must, that Aguilar did in fact have suicidal ideations, there is no indication that County intake officers were aware of those suicidal ideations. Plaintiff does not allege, for example, that

Aguilar disclosed his ideations to the intake officers, who then ignored them. Nor does Plaintiff allege that the unnamed officers failed to discover Aguilar's suicidal ideations because they did not conduct a proper intake interview.").

3. Defendants Gooden, Jimenez-Puente, and Najac

Plaintiffs allege that, on October 22, 2023, Defendant Gooden "documented that Ms. DeLuca presented with facial swelling and referred her to County Mental Health for 'ADHD and unknown psychiatric disorders.'" (Doc. 31 ¶ 44). On October 23, 2023, Defendant Najac "evaluated Ms. DeLuca and documented that she presented with a swollen jaw and reported pain to her back, hip, and neck from an altercation prior to her arrest." Defendant Najac noted that Ms. DeLuca "had 'extensive mental health challenges' and was 'not able to advocate for herself.'" *Id.* ¶ 49. On October 24, 2023, an unnamed "Doe" Defendant, at the direction of Defendant Jimenez-Puente (a licensed clinical social worker), conducted a "suicide-risk screening and noted Ms. DeLuca's hopelessness, withdrawn affect, stiffness, and poor eye contact but nevertheless reported she was not an imminent risk of suicide." *Id.* ¶ 50.

As noted above, Plaintiffs assert in conclusory fashion that "KCSO custody staff, medical staff and mental health staff were aware that Ms. DeLuca had a history of serious mental health issues including prior suicide attempts and multiple psychiatric hospitalizations that placed her at an increased risk of suicide," and "competent custody staff and/or mental health staff should have considered Ms. DeLuca's underlying arrest charges to be a red flag," as well as "noted the arrest as a significant problem with impulse control, which too is associated with elevated suicide risk." *Id.* ¶ 45. But Plaintiffs allege no facts as to how Defendants Gooden and Najac knew of Ms. DeLuca's increased risk of suicide. Though Plaintiffs assert that Gooden and Najac knew of psychiatric disorders and mental health challenges, knowledge of such facts, by itself, is not sufficient to impart a heightened risk of suicide.

Regardless, even if said Defendants were aware of this fact, Plaintiffs do not assert facts establishing that Defendants Gooden, Jimenez-Puente, and Najac were deliberately indifferent despite having knowledge of a heightened risk and/or recklessly disregarded that risk, or facts that would permit the drawing of a reasonable inference of such. Defendant Gooden, a registered nurse

(*id.* ¶ 28), documented physical injuries on Ms. DeLuca's body and referred her to County Mental Health for ADHD and other unknown psychiatric disorders. Plaintiffs do not set forth facts as to how Defendant Gooden's actions exhibited deliberate indifference or reckless disregard. Seemingly to the contrary, Plaintiffs allege that Defendant Gooden referred Ms. DeLuca to County Mental Health in regard to her mental health conditions.

Plaintiffs assert that the day after Defendant Gooden examined Ms. DeLuca and referred her to County Mental Health, Defendant Najac noted that Ms. DeLuca was experiencing swelling and pain, and presented with extensive mental health challenges. Plaintiffs do not assert facts that Defendant Najac was deliberately indifferent or exhibited reckless disregard. Plaintiffs do not allege, for instance, that Defendant Najac was required to complete some activity to effectuate Ms. DeLuca's referral to County Mental Health and failed to do so.

Plaintiffs provide that Defendant Jimenez-Puente, a licensed clinical social worker (*id.* ¶ 27), referred Ms. DeLuca to a "Doe" Defendant, who was a clinician (*id.* ¶ 26). The Doe Defendant conducted a suicide-risk screening and found that Ms. DeLuca was not at imminent risk of suicide, but that she exhibited hopelessness, withdrawn effect, stiffness, and poor eye contact. Once again, these bare facts are sufficient to permit the drawing of any reasonable inference that Defendant Jimenez-Puente was indifferent to, or recklessly disregarded, a heightened risk of suicide, particularly given she referred Ms. DeLuca for a suicide risk-screening.

4. <u>Defendant Comparan</u>

Plaintiffs allege that, on October 22, 2023, after being medically cleared. Ms. DeLuca was transported by Defendant Deputy Comparan to the Lerdo Pre-Trial Facility "while she cried uncontrollably and told [Comparan], 'Please, please, please shoot me.'" Ms. DeLuca "proceeded to bang her head on the interior of the patrol vehicle." Defendant Comparan "failed to summon medical or mental health assistance and proceeded to book her into custody," despite her "obvious psychiatric distress and clear suicidal ideation." *Id.* ¶ 47 (emphasis omitted).

It is not clear from the allegations in the FAC whether Defendant Comparan, a corrections deputy in the Transportation Unit (*id.* ¶ 23), transported Ms. DeLuca to the Lerdo Pre-Trial Facility from Kern Medical or from County Mental Health. *See id.* ¶¶ 43, 47-48. The FAC appears to plead

that the transport was after her "routine" medical clearance, which occurred at Kern Medical. In that event, it appears from the complaint that Defendant Gooden thereafter referred Ms. DeLuca to County Mental Health. *Id.* ¶¶ 43, 44. However, the timeline of events is ambiguous as the allegations do not clearly set forth whether Defendant Gooden was the individual who rejected Ms. DeLuca from booking, resulting in her transfer thereafter to Kern Medical by unnamed deputies for "routine clearance," following which she was then returned to Lerdo Pre-Trial Facility (presumably by Defendant Comparan); or if some other individual rejected Ms. DeLuca from booking, with Defendant Gooden then examining Ms. DeLuca only after her return to Lerdo Pre-Trial Facility following the "routine clearance" (again presumably being transported by Defendant Comparan). *See id.* ¶¶ 43-44, 47-48.

Assuming without deciding that the facts alleged establish that a reasonable officer in Defendant Comparan's position would have appreciated that Ms. DeLuca suffered from a heightened risk of suicide, the FAC's allegations do not adequately demonstrate that Defendant Comparan failed to take reasonable available measure to abate that risk. *Gordon*, 888 F.3d at 1125. Importantly, an officer in Defendant Comparan's position violates the Fourteenth Amendment if he fails to communicate knowledge of an arrestee's heightened risk of suicide "to those who will next be responsible for her custody and safety." *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2010), *vacated by* 563 U.S. 915, 131 S. Ct. 1812 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011); *see Christie v. Dep't of Corr.*, No. 3:22-cv-05692-TMC, 2024 WL 3939287, at *13 (W.D. Wash. Aug. 26, 2024) ("the import of *Conn* is that the failure to communicate knowledge of an arrestee's serious risk of suicide can establish deliberate indifference"). Here, though Plaintiffs allege that Defendant Comparan failed to summon medical assistance and thereafter proceeded to book Ms. DeLuca into custody, they do not assert that Comparan failed to report the incident involving Ms. DeLuca in his patrol vehicle to those who were next responsible for Ms. DeLuca's custody. Indeed, although as explained above the relevant timeline is not clear, the FAC contains allegations permitting a reasonable inference that Defendant Comparan did convey information about the incident in his patrol vehicle to pretrial facility staff because, once there, Ms. DeLuca was examined by Defendant Gooden and referred to County

Mental Health.

Defendant Comparan's failure to summon medical assistance, in the event he was transporting Ms. DeLuca to be seen at Lerdo Pre-Trial Facility by Defendant Gooden, a registered nurse (*id.* ¶ 28), does not by itself establish indifference to, or reckless disregard of, a heightened risk of suicide. And if it was Defendant Rojas that processed Ms. DeLuca after she was transported by Defendant Comparan, Plaintiffs do not plead in the FAC that Defendant Comparan failed to report Ms. DeLuca's actions in his patrol vehicle to Defendant Rojas. Because it is not alleged in the FAC that Defendant Comparan failed to convey Ms. DeLuca's conduct in his patrol vehicle to relevant facility staff and the facts alleged do not permit the drawing of any reasonable inference that he so failed to report, Plaintiffs fail to cognizably allege that Defendant Comparan was indifferent to, or recklessly disregarded, a heightened risk of suicide.

***iii. Analysis – Third Cause of Action***

The Court finds that Plaintiff's third cause of action fails against Defendants for the same reasons as noted above. Namely, Plaintiffs have failed to sufficiently allege facts demonstrating that any Defendant exhibited deliberate indifference. *See Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation. Therefore, because there is no evidence that either Undersheriff Mineau or Lassen County was deliberately indifferent to Parker's serious medical needs, Schwarz's claim for loss of familial association—which is predicated on their purportedly unconstitutional care of Parker—likewise fails as a matter of law.") (citing *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004)).

**B. Federal Claims Against County Entities**

***i. Legal Standard***

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Local governments

are responsible only for their own illegal acts; they are not vicariously liable for their employees' actions. *Connick v. Thompson*, 563 U.S. 51, 60 (2011).

A municipality is held liable only when "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Monell*, 436 U.S. at 691. This "official municipal policy" need not be expressly adopted, "[i]t is sufficient that the constitutional violation occurred pursuant to a longstanding practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (citation and quotations omitted). A policy can also be one of action or inaction, such as a failure to train employees when such omissions amount to the government's policy. *See Long*, 442 F.3d at 1189 ("[A] county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference[.]").

Thus, to establish a § 1983 claim for municipal liability, a plaintiff must show: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation. *Burke v. County of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009).

Courts in the Ninth Circuit use a two-part test to evaluate whether factual allegations regarding municipal liability are sufficiently pled: "First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *A.E. ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

"Under Ninth Circuit precedent, [a] policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations. In an 'omission' action, a plaintiff must show the municipality's policy of inaction amounts to deliberate indifference to the plaintiff's constitutional right, and that the policy caused the violation, in the sense that the

[municipality] could have prevented the violation with an appropriate policy." *Fosbinder v. Cnty. of San Diego*, No. 24-cv-733-RSH-SBC, 2024 WL 4631275, at *10 (S.D. Cal. Oct. 30, 2024) (alterations in original; quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)).

***ii. Analysis – Monell Claims***

County Defendants seek dismissal of Plaintiffs' fourth cause of action along with *Monell* claims they argue are included within the first, second, third, and fifth causes of action. *See* (Doc. 39-1 at 21-23).

Plaintiffs allege that the County and high-level supervisors such as Defendant Youngblood "knew or should have known of a history of years of notice of ongoing failure to provide inmates indicated and timely reasonable medical/mental health care," "inadequate and/or incompetent staffing, insufficient and inadequate cells and beds, incompetent and inadequate provision of health care and delivery thereof, denying access to outside hospitals or other mental health programs," and "failure to take corrective measures, including ignoring judicial orders to abate or take corrective action …" (Doc. 31 ¶ 61). Plaintiffs also allege that, in 2023, KCSO jails have recorded 11 in-custody deaths, including five from natural causes and six from suicide. *Id.* ¶ 63. Plaintiffs further plead that, from January 2008 through December 2023, 22 inmates have died by suicide within the jails of the County of Kern. *Id.* ¶ 64. Plaintiffs provide 11 other instances dating from 2020 to 2023 where individuals died while detained in County facilities as a result of suicide, or circumstances suggestive of suicide. *Id.* ¶¶ 65-75.

Defendants argue that, where a plaintiff fails to adequately plead deprivation of a constitutional right, the *Monell* claims fail as a matter of law. (Doc. 39-1 at 22; citing *Cavanaugh v. Cnty. of San Diego*, No. 3:18-cv-02557-BEN-LL, 2020 WL 6703592, at *36 (S.D. Cal. Nov. 12, 2020), *judgment entered*, 2020 WL 6702029 (Nov. 13, 2020), *and aff'd*, No. 20-56311, 2021 WL 6103115 (9th Cir. Dec. 22, 2021)).

In *Cavanaugh*, the Court of Appeals reasoned that, "[b]ecause the complaint did not adequately plead a constitutional violation by the individual defendants, the district court correctly dismissed the *Monell* claim against San Diego County." *Cavanaugh*, 2021 WL 6103115, at *1 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). It follows that, even if the *Monell*

allegations in the complaint would by themselves be sufficient to state a *Monell* claim against the County, the failure of Plaintiffs to plead any constitutional violation by individual Defendants results in a failure of any such *Monell* claim. *Cf. Est. of Kamara v. Cnty. of San Diego*, No. 25-cv-0226-AJB-VET, 2026 WL 751429, at *6 (S.D. Cal. Mar. 17, 2026) (denying dismissal of *Monell* claims where defendants did not move to dismiss underlying deliberate indifference claims, noting the FAC asserts a "longstanding custom of arresting [] intoxicated or mentally ill individuals rather than diverting them to hospitals," that the "Department has a custom and practice" of such arrests, that "deputies frequently arrest and jail" such individuals, and "County was aware" of the pattern of deaths therefrom, with plaintiffs alleging 20 such deaths over an 11-year period).

The Court finds that, as Plaintiffs have failed to plead any underlying constitutional violations by the individual Defendants, Plaintiffs' *Monell* claims fail. *See, e.g.*, *Harris v. Cnty. of San Diego*, No. 3:24-cv-2117-JES-KSC, 2025 WL 2441046, at *6 (S.D. Cal. Aug. 25, 2025) ("Although Plaintiff alleged constitutional violations against Sheriff Martinez and doe defendants, such claims are not adequately pled, as stated above. As discussed above, Plaintiff fails to allege a violation of his constitutional rights by any individual. Therefore, Plaintiff's *Monell* cause of action against the County is [dismissed].").

Additionally, any *Monell* claims included within the first, third, and fifth causes of action are brought against improper defendants. The first and third causes of action are brought against individual Defendants, not municipal entities, and thus include improper defendants for any *Monell* claims. The fifth cause of action is brought against the supervisory Defendants, sued in their individual capacity. The fifth cause of action, thus, also includes improper defendants for any *Monell* claims. Though Defendants' motion seeks dismissal of *Monell* claims within the second cause of action, Plaintiffs do not allege any such *Monell* claims within the second cause of action. *See* (Doc. 31 at 29-31).

Therefore, the *Monell* claims included in the first, third, fourth, and fifth causes of action are subject to dismissal.

///

///

**C. Federal Claims Against Supervisory Defendants**

***i. Legal Standard***

Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of respondeat superior. *Iqbal*, 556 U.S. at 676-77; *see, e.g.*, *Simmons v. Navajo Cnty., Ariz*., 609 F.3d 1011, 1020-21 (9th Cir. 2010) (noting that liability attaches if the named supervisory defendants "themselves acted or failed to act unconstitutionally, not merely that a subordinate did"), *overruled on other grounds by Castro*, 833 F.3d at 1070; *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983").

Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009); accord *Starr v. Baca*, 652 F.3d 1202, 1205-06 (9th Cir. 2011) (supervisory liability may be based on inaction in the training and supervision of subordinates).

Supervisory liability may also exist without any personal participation if the official implemented "a policy so deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation." *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations and quotations marks omitted), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1970).

To prove liability for an action or policy, the plaintiff "must ... demonstrate that his deprivation resulted from an official policy or custom established by a ... policymaker possessed with final authority to establish that policy." *Waggy v. Spokane Cnty. Washington*, 594 F.3d 707, 713 (9th Cir. 2010). When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). Vague and conclusory allegations concerning the

involvement of supervisory personnel in civil rights violations are not sufficient. *See Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

***ii. Analysis***

Plaintiffs assert supervisory liability claims pursuant to section 1983 against certain Defendants. (Doc. 31 at 45-48). Plaintiffs allege that Defendant Youngblood should have known of years of "ongoing failure to provide inmates … medical/mental health care," "inadequate and/or incompetent staffing," "inadequate cells and beds," "inadequate provision of health care," and "failure to take corrective measures." Plaintiffs allege that Defendant Youngblood was on notice of said deficiencies and the "number of lawsuits against the [County] … and the evidence available from those actions is troubling and demonstrative of Defendants' years of deliberate indifference …" *Id.* ¶ 61.

Plaintiffs further allege that Defendants Youngblood, Lucio, Medina, and Weigand failed to properly hire and train the employees of their agencies; failed to monitor, investigate, and discipline employees; and ratified unconstitutional customs, policies, practices, and procedures. These acts or omissions, Plaintiffs allege, were a proximate cause of the deprivations that led to violation of Ms. DeLuca's constitutional rights. *Id.* ¶¶ 145-148. In support of these allegations, Plaintiffs plead only the same facts as noted *supra* in subsection (B)(ii) discussing the *Monell* claims, namely, prior cases of in-custody deaths and suicides. Plaintiffs' primary contention is that, as Sheriff, Defendant Youngblood's inaction and acquiescence resulted in constitutional deprivations and the actions or omissions of the individual Defendants were ratified by Defendants Lucio, Medina, and Weigand. *See id.*

First, as noted *supra* in subsection (A)(ii), Plaintiffs fail to plead any cognizable claims for relief against the individual Defendants. It follows that Plaintiffs, thus, fail to adequately allege any acquiescence from the supervisory Defendants in such claims.

Second, Plaintiffs do not set forth any identifiable policy, custom, or practice implemented by any supervisory Defendant that was so deficient that the policy itself is a repudiation of the constitutional rights at issue and is the moving force of the constitutional violations alleged herein.

Rather, Plaintiffs advance only conclusory and general allegations that the supervisory Defendants ratified unconstitutional policies.

Third, the factual pleadings offered by Plaintiffs in support of the *Monell* claims do not, by themselves, support supervisory liability claims. To credit such allegations standing alone as supporting supervisory liability would, in effect, impose vicarious liability, which is impermissible in section 1983 actions. *See Keates v. Koile*, 883 F.3d 1228, 1242 (9th Cir. 2018) ("Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") (quotation omitted). In any event, the Court has found that the *Monell* claims fail, as well, for Plaintiffs' failure to plead any cognizable claims against the individual Defendants.

Thus, Plaintiffs fail to plead cognizable claims against Defendants Youngblood, Lucio, Medina, and Weigand under a theory of supervisory liability. *See, e.g.*, *Keates*, 883 F.3d at 1243 ("The complaint here does not allege that Carter was directly involved in the allegedly unconstitutional conduct or that he had knowledge of the constitutional deprivations and acquiesced in them. Rather, the complaint makes conclusory allegations that Carter promulgated unconstitutional policies and procedures which authorized the particular conduct in this case and thus directly caused Koile's allegedly unconstitutional conduct. These allegations do not suffice to state a claim of supervisory liability."); *Est. of Miller v. Cnty. of Sutter*, No. 2:20-cv-00577-KJM-DMC, 2020 WL 6392565, at *14 (E.D. Cal. Oct. 30, 2020) ("The complaint here does not allege the Sheriff made any decisions about Miller's care. It does little more than recite the elements of a claim for supervisory liability."); *Kidwell-Bertagnolli v. Cnty. of Sonoma*, No. 20-cv-03291-JSC, 2020 WL 4901197, at *4 (N.D. Cal. Aug. 20, 2020) ("These allegations, however, do not indicate that Sheriff Essick was 'directly involved in the allegedly unconstitutional conduct' which resulted in Mr. Bertagnolli's death or that 'he had knowledge of the constitutional deprivations and acquiesced in them. Rather, the complaint makes conclusory allegations that [Sheriff Essick] promulgated unconstitutional policies and procedures which authorized the particular conduct in this case and thus directly caused [Deputy Ordaz and Deputy 1-10's] allegedly unconstitutional conduct.'") (alterations in original; quoting *Keates*, 883 F.3d at 1243).

**D. Qualified Immunity**

***i. Legal Standard***

The doctrine of qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating a claim of qualified immunity, a court must determine whether, (1) taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and (2) if so, whether the right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In its qualified immunity analysis, a court may use either prong as its starting point and, thus, exercise its "discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).

Under the first prong of the analysis, "whether a constitutional right was violated … is a question of fact." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009); *see Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (explaining that under the first prong of the qualified immunity analysis, the court considers whether the facts show a violation of a constitutional right). In contrast, "the 'clearly established' inquiry is a question of law that only a judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017); *see Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent," meaning "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)). Stated differently, "[a] right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rosenbaum v. City of San Jose*, 107 F.4th 919, 924 (9th Cir. 2024) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)) (citation omitted). A section 1983 plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct. *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023) ("There is no

analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions. Nor must § 1983 defendants come forward with precedent showing that the unlawfulness of their conduct was not clearly established."); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991).

"For a constitutional right to be clearly established, a court must define the right at issue with specificity and not … at a high level of generality." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (citation and internal quotations omitted). When identifying the right that was allegedly violated, a court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than all of the factual circumstances surrounding the alleged violation. *See Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1092–93 (9th Cir. 1998). "The Supreme Court has 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage of litigation." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

While a defendant may raise a qualified immunity defense at an early stage in the proceeding, the defense may not be amenable to dismissal by way of a motion made pursuant to Rule 12(b)(6) where facts necessary to establish the affirmative defense implicate matters outside the complaint or disputed issues of fact. *See Morley v. Walker*, 175 F.3d 756, 761 (9th Cir. 1999). Nevertheless, a qualified immunity defense properly may be resolved by a Rule 12(b)(6) motion bearing in mind that, on a motion to dismiss, a court must accept the allegations in the complaint as true when determining whether a defendant is entitled to immunity. *See Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023); *see also Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

***ii. Analysis***

It is plain that, at the time of the events at issue, the law was clearly established that pretrial detainees have a Fourteenth Amendment right to be free from deliberate indifference to their medical needs, including the risk of suicide. *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060; *Wright v. Dunne*, No. 15-cv-02671-TLN-CKD, 2020 WL 977963, at *8 (E.D. Cal. Feb. 28, 2020) ("The Court agrees that

there exists a clearly established right to be free from deliberate indifference to serious mental health needs, including risk of suicide.") (citing *Clouthier*, 591 F.3d at 1245)). However, this general statement of law does not define in this case the applicable constitutional right at issue for purposes of determining the applicability of qualified immunity. *See Gordon*, 6 F.4th at 968; *Watkins*, 145 F.3d at 1092-93.

Plaintiffs bear the burden of proof to show that the rights allegedly violated were clearly established at the time of the alleged misconduct. *See Hopson*, 71 F.4th at 708. However, Plaintiffs cite to no authority in support of their assertion that the County Defendants are not entitled to qualified immunity. *See* (Docs. 42, 49, 55). The Court has conducted an independent review of relevant authority and finds that, under the facts as pled in the operative complaint, the individual County Defendants are entitled to qualified immunity. The Hospital Defendants do not raise any argument in their motion as to qualified immunity for Defendant Gooden and, therefore, the Court does not reach any argument regarding qualified immunity for Defendant Gooden. *See* (Doc. 47).

In *Taylor v. Barkes*, 575 U.S. 822 (2015), the Supreme Court reversed the Third Circuit's holding that the Eighth Amendment granted prisoners the "right to the proper implementation of adequate suicide prevention protocols." *Taylor*, 575 U.S. at 824. Relevant Ninth Circuit precedent holds similarly, namely, that pre-trial detainees have a right to be "free from deliberate indifference to their serious risk of suicide but not a right to suicide screening or prevention protocols." *Est. of Funabiki by & through Funabiki v. Cnty. of Whitman*, No. 2:21-cv-00089-MKD, 2024 WL 4425682, at *11 (E.D. Wash. Oct. 5, 2024) (citing cases); *see Germaine-McIver v. Cnty. of Orange*, No. SACV 16-01201-CJC (GJSx), 2018 WL 6258896, at *11-12 (C.D. Cal. Oct. 31, 2018) ("The Ninth Circuit has also not clearly established any right to a certain standard of suicide prevention protocols … *Cabrales* and *Conn* fail to develop any right in such a concrete and factually defined context to make it obvious to all reasonable government actors …") (quotation and citation omitted) (referencing *Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454 (9th Cir. 1988), *cert. granted, judgment vacated*, 490 U.S. 1087 (1989), *and opinion reinstated*, 886 F.2d 235 (9th Cir. 1989), & *Conn*, 591 F.3d at 1102, *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *and opinion reinstated*, 658 F.3d 897 (9th Cir. 2011)); *NeSmith v. Cnty. of San*

*Diego*, No. 15-cv-629 JLS (JMA), 2016 WL 4515857, at *6 (S.D. Cal. Jan. 27, 2016) (finding that "the Supreme Court was clear in *Taylor* that cases holding that reckless or deliberate indifference to suicidal tendencies of particular inmates do not, for purposes of qualified immunity, establish an affirmative obligation to implement a government entity-wide suicide prevention policy").

As noted *supra*, Plaintiffs have failed to advance any cognizable claims of deliberate indifference to Ms. DeLuca's serious risk of suicide by the individual Defendants. At the time of the events set forth in the operative complaint, clearly established law did not obligate the individual Defendants to conduct certain specific screening or prevention protocols. As such, under the facts as pled in the operative complaint, the individual County Defendants are entitled to qualified immunity.

Regarding supervisory Defendants Youngblood, Lucio, Medina, and Weigand, Plaintiffs assert only vague allegations of failure to properly hire, train, and discipline employees; promulgation of deficient policies, customs, or practices; and ratification of unconstitutional policies, customs, or practices. At the time of the events set forth in the operative complaint, clearly established law did not obligate the supervisory Defendants to implement a specific, or superior, suicide treatment or prevention policy. It follows that, under the facts as pled in the operative complaint, Defendants Youngblood, Lucio, Medina, and Weigand are entitled to qualified immunity. *See NeSmith*, 2016 WL 4515857, at *7 ("Although particular government actors are obligated not to act with deliberate indifference to a particular inmate's suicidal ideations, based on *Taylor*, that does not clearly establish a broader duty for government entities to implement a suicide prevention policy that meets certain unspecified standards.").

### E. State Law Claims

#### *i. Negligence*

A claim for negligence under California law requires a plaintiff to show that the defendant (1) had a legal duty to use reasonable care; (2) breached that duty; and that (3) the breach was the proximate cause of (4) the plaintiff's injury. *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998). "In California, prison officials owe detainees a duty to protect them from foreseeable harm." *Cotta v. Cnty. of Kings*, 686 F. App'x 467, 469 (9th Cir. 2017) (citing *Giraldo*

*v. Cal. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231 (2008)). Unless the law provides otherwise, public employees are liable to the same extent as private persons, and "public entities are generally liable for injuries caused by the negligence of their employees acting in the scope of their employment." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). The Court acknowledges that the standard of culpability for a negligence claim is a "much lower level" than the standard for a deliberate indifference claim. *Cravotta v. Cnty. of Sacramento*, 717 F. Supp. 3d 941, 967 (E.D. Cal. 2024) (citing *Castro*, 833 F.3d at 1071).

Plaintiffs assert their negligence claims, the sixth cause of action, against only the County Defendants and not the Hospital Defendants. (Doc. 31 at 48). Notably, Plaintiffs do not allege that either Defendants Amparo or Gonzalez failed to discharge their duty to take some mandatory action in the lead-up to the incident. For instance, Plaintiffs do not assert that Amparo, by virtue of his position as a floor deputy, failed to conduct a safety check or was required to enforce certain safety protocols regarding Ms. DeLuca's shower. Plaintiffs do not assert that any policy or procedure, or some other authority, established a duty to refer a detainee to a psychiatrist upon the detainee indicating they were too unwell to attend court.

Nor do Plaintiffs allege that Defendants Jimenez-Puente and Najac failed to discharge their duty to take any mandatory action. Plaintiffs assert that Defendant Najac noted Ms. DeLuca's mental health challenges but do not allege that Najac failed to take some action, such as to affirmatively report such challenges to an individual or place some visual or administrative indicator on Ms. DeLuca's person or record. Plaintiffs similarly fail to assert the same against Defendant Jimenez-Puente, asserting only that she referred Ms. DeLuca to a "Doe" Defendant who conducted a suicide-risk screening; there are no allegations that Jimenez-Puente failed to act in some way or that her referral was in some way deficient.

Likewise, Plaintiffs do not allege that Defendant Rojas failed, for instance, to properly conduct the interview with Ms. DeLuca, provide Ms. DeLuca a visual indicator regarding her condition, or affirmatively notify other staff as to Ms. DeLuca's status as per some applicable authority. Thus, the Court finds these allegations insufficient to state a cognizable claim of negligence as to Defendants Amparo, Gonzalez, Jimenez-Puente, Najac, and Rojas. *See* Cal. Gov't

Code § 815.2; *Hayes*, 57 Cal. 4th at 629; *e.g., Cravotta*, 717 F. Supp. 3d at 967 ("While prison officials may owe detainees a duty to protect them from foreseeable harm, Plaintiff has failed to allege how the Officer Defendants breached that duty here, or how that breach caused Plaintiff injury. Plaintiff has not alleged the Officer Defendants failed to conduct direct-view safety checks, or failed to administer life saving measures they were medically trained to administer. Plaintiff has also not alleged how any such measures could have produced a different outcome.").

As to Defendant Comparan, Plaintiffs allege that, on October 22, 2023, he transported Ms. DeLuca to Lerdo-Pre Trial Facility after she was medically cleared. While in the patrol car, she "cried uncontrollably and told Comparan to, "'Please, please, please shoot me'" and proceeded to "bang her head on the interior of the patrol vehicle." Plaintiffs assert that Defendant Comparan "failed to summon medical or mental health assistance and proceeded to book her into custody." (Doc. 31 ¶ 47). Even if the Court finds that Defendant Comparan breached his duty of care, Plaintiffs do not assert that this breach was the proximate cause of the harm alleged. The shower incident occurred five days later, on October 27, 2023, and Plaintiffs assert that, in between Defendant Comparan's transport and the incident, Ms. DeLuca had a suicide-risk screening that found she was "not at imminent risk of suicide." *Id.* ¶¶ 50, 52. Plaintiffs do not allege that Defendant Comparan's failure to summon medical assistance was a proximate cause of any resulting harm. For instance, Plaintiffs do not assert that had Defendant Comparan summoned medical assistance, it would have altered Ms. DeLuca's classification or housing, or impacted her care and supervision in some other way. Further, Plaintiffs do not allege that Defendant Comparan failed to report the events in the patrol car; no facts relating to any reporting, or lack thereof, of the events in the patrol care are alleged in the complaint.

As to Defendants Youngblood, Lucio, Medina, and Weigand, Plaintiffs' only relevant allegations in the FAC are those noted *supra* regarding supervisory liability. Without more, the Court cannot discern any theory of negligence cognizable against said Defendants. *Cf. Cravotta*, 717 F. Supp. 3d at 968 (finding cognizable negligence claim where complaint sufficiently alleged deliberate indifference and a breach of the duty of care regarding classification and housing against "Doe" defendants and that the sheriff had knowledge of such repeated failures and knew of safety

risks inherent in the errors). Plaintiff fails to allege what duty was breached by supervisory Defendants and, importantly, how any such breach caused Ms. DeLuca's injury and/or damages.

***ii. California Government Code § 845.6***

California Government Code § 845.6 "imposes liability on the public employee and public entity when: (1) the public employee knows or has reason to know of the need, (2) for a prisoner's immediate medical care, and (3) fails to take reasonable action to summon such medical care. Liability under section 845.6 is established by serious and obvious medical conditions requiring immediate care." *Borges v. City of Eureka*, No. 15-cv-00846-YGR, 2017 WL 363212, at *18 (N.D. Cal. Jan. 25, 2017) (internal quotations and citations omitted) (citing *Watson v. State of California*, 21 Cal. App. 4th 836, 841 (1993), & *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1070 (2013)).

A public employee and public entity are liable under § 845.6 only for a failure to summon medical care. Any failure to provide further treatment, or to ensure further diagnosis, is not actionable under § 845.6. *Castaneda*, 212 Cal. App. 4th at 1072. Under § 845.6, a public entity is vicariously liable for the acts of its employees within the scope of their employment. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 605 (9th Cir. 2019) (citing Cal. Gov't Code § 815.2).

Here, Plaintiffs do not identify any basis for their § 845.6 claims aside from the alleged federal constitutional violations. But as addressed above, Plaintiffs do not plead sufficient facts showing that Defendants failed to summon medical care despite knowing, or having a reason to know, of such immediate need. Indeed, Plaintiffs assert that Defendant Gonzalez broadcast a medical emergency after Ms. DeLuca's fall and called for assistance, with Defendants Amparo, Lucio, and Weigand responding. (Doc. 31 ¶ 52).

As such, Plaintiffs fail to plead any cognizable claims under § 845.6 against any Defendant.

***iii. California Civil Code § 52.1 ("Bane Act")***

A plaintiff alleging a Bane Act claim "must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015) (citing Cal. Civ. Code § 52.1). The claim must allege facts that would allow an

inference that the defendant had a specific intent to violate the constitutional right at issue. *Id.* Specific intent may be shown by demonstrating that the defendant acted "in reckless disregard" of that right. *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 803 (2017).

Several district courts, including judges of this Court, "have adopted the position that a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs ... adequately states a claim for relief under the Bane Act because deliberate indifference claims extend far beyond ordinary tort claims and have been associated with affirmatively culpable conduct." *Cravotta*, 717 F. Supp. 3d at 964 (quotations and citation omitted) (citing cases).

Here, Plaintiffs do not identify any basis for their Bane Act claims aside from the alleged federal constitutional violations. As noted *supra*, Plaintiffs fail to adequately allege cognizable claims against all individual and supervisory Defendants. Thus, Plaintiffs fail to bring any cognizable Bane Act claims against them. *See Cravotta*, 717 F. Supp. 3d at 965 ("However, as held above, Plaintiff has failed to sufficiently plead his deliberate indifference claim against the Officer Defendants. Thus, the Court finds he has also failed to plead a Bane Act claim against the Officer Defendants, and the Bane Act claim against them is dismissed.").

Regarding the County of Kern, pursuant to California Government Code § 815.2, Plaintiffs allege that it is vicariously liable for the acts or omissions of their employees committed within the course and scope of their employment. (Doc. 31 ¶¶ 171). However, Plaintiffs fail to cognizably plead any such acts or omissions. Thus, Plaintiff's Bane Act claims against the County of Kern likewise fail. *See Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1196 (E.D. Cal. 2018) ("Plaintiff argues that his complaint contains sufficient allegations against defendant Christianson so as to impose liability on the County. This argument is unavailing because, as already discussed above, plaintiff's complaint contains no factual allegations against defendant Christianson."); *cf. Brink v. Cnty. of San Diego*, No. 23-cv-1756 DMS (SBC), 2024 WL 3315992, at *8 (S.D. Cal. July 3, 2024) (discussing California statutory authority regarding county immunity from Bane Act claims, concluding that immunity does not attach where public employee knew or had reason to know that the prisoner was in need of immediate medical care and failed to

take reasonable action to summon such care, and finding Bane Act claim against county sufficient where complaint alleged nurse defendants failed to summon medical care despite obvious symptoms).

***iv. Dangerous Condition on Public Property/Premises Liability***

Though Plaintiffs cite to 28 U.S.C § 2201 in their cause of action for dangerous condition on public property and premises liability, as that statute is inapplicable to the cause of action alleged, the Court presumes it is cited in error and likely relates to the next cause of action for declaratory relief, as discussed below. (Doc. 31 at 54).

"A public entity … is not liable for an injury arising out of an act or omission of the public entity or its employees except as provided by statute. The sole statutory basis for imposing liability on public entities as property owners is [California] Government Code section 835." *Cerna v. City of Oakland*, 161 Cal. App. 4th 1340, 1346–47 (2008). "To state a cause of action against a public entity under section 835, a plaintiff must plead: (1) a dangerous condition existed on the public property at the time of the injury; (2) the condition proximately caused the injury; (3) the condition created a reasonably foreseeable risk of the kind of injury sustained; and (4) the public entity had actual or constructive notice of the dangerous condition of the property in sufficient time to have taken measures to protect against it." *Brenner v. City of El Cajon*, 113 Cal. App. 4th 434, 439 (2003).

However, the California Government Code provides that, other than certain exceptions, a public entity is not liable for injury to a prisoner due to a dangerous condition of public property. Cal. Gov't Code § 844.6(a)(2) and (c). By enacting this statute, the legislature intended that prisons be immune from claims by prisoners due to a dangerous condition of public property. *See Badiggo v. Cty. of Ventura*, 207 Cal. App. 3d 357, 361 (1989).

Under section 844.6, a "prisoner is defined as 'an inmate of a prison, jail, or penal or correctional facility.' 'For the purposes of this chapter, a lawfully arrested person who is brought into a law enforcement facility for the purpose of being booked, as described in Section 7 of the Penal Code, becomes a prisoner, as a matter of law, upon his or her initial entry into a prison, jail, or penal or correctional facility, pursuant to penal processes.'" *Colbert v. Cnty. of Riverside*, No.

5:25-cv-01655-SP, 2026 WL 931542, at *3 (C.D. Cal. Mar. 31, 2026) (citing Cal. Gov't Code § 844.).

Thus, the County of Kern, KCSO, and KCHA are immune from liability from Plaintiffs' claims of dangerous conditions on public property. *See id.* at *4 ("But as stated above, § 844.6(a)(2) provides for immunity from an injury to any prisoner. Indeed, § 844.6(c) specifically bars a prisoner's claim for a dangerous condition of public property. And contrary to plaintiff's assertion, pretrial detainees are prisoners under this chapter of the Government Code.") (citation omitted).

Section 844.6 does not, however, exonerate a public employee from liability for an injury caused by his or her negligent act or omission. Cal. Gov't Code § 844.6(d). Under California law, "[p]remises liability is a form of negligence." *Brooks v. Eugene Burger Mgmt. Corp.*, 215 Cal. App. 3d 1611, 1619 (1989); *see Wilson v. J.P. Allen Co.*, 57 F. Supp. 3d 1249, 1253 (C.D. Cal. 2014) ("The same concepts of duty applicable to general negligence claims apply to premises liability claims"). "The owner of premises is under a duty to exercise ordinary care in the management of such premises in order to avoid exposing persons to an unreasonable risk of harm. A failure to fulfill this duty is negligence." *Brooks*, 215 Cal. App. 3d at 1618 (quoting BAJI 8.00 (1983 rev.)).

To state a premises liability claim, the plaintiff must allege "that the defendant owned or controlled the property, that the defendant was negligent in the use or maintenance of the property, that the plaintiff was harmed, and that the defendant's negligence was a substantial factor in causing the harm." *Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1144 (N.D. Cal. 2014). "A person who owns or controls property is negligent if he or she fails to use reasonable care to discover any unsafe conditions and to repair, replace, or give adequate warning of anything that could be reasonably expected to harm others." *Id.* at 1144-45.

As to the non-entity Defendants, Plaintiffs fail to state a cognizable claim of premises liability. First, Plaintiffs do not oppose Hospital Defendants' motion as to Defendant Gooden, and the motion will be granted therefor. (Doc. 48 at 13). Second, as to the other non-entity Defendants, Plaintiffs fail to allege that any non-entity Defendant owned or controlled the property, other than a conclusory a statement that unnamed defendants did so. (Doc. 31 ¶ 174). Additionally, Plaintiffs

advance only conclusory allegations that the "Lerdo Pre-Trial Facility was in a dangerous condition" at the time of the incident, without asserting any facts in support. *See id.*; *Cerna*, 161 Cal. App. 4th at 1347-48 ("[A] claim alleging a dangerous condition may not rely on generalized allegations but must specify in what manner the condition constituted a dangerous condition. A plaintiff's allegations, and ultimately the evidence, must establish a physical deficiency in the property itself. A dangerous condition exists when public property 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself,' or possesses characteristics in its design, location, features or relationship to its surroundings that endanger users.") (citations omitted).

Lastly, Plaintiffs plead that the County of Kern and KCSO are vicariously liable for the violations of state law under § 815.2. (Doc. 1 ¶ 176). Notwithstanding the medical care exception (*see Brink*, 2024 WL 3315992, at *8), "§ 844.6(d) expressly states that a public entity 'is not required to pay any judgment ... or indemnify any public employee, in any case where the public entity is immune from liability under this section.' Plaintiff cannot get around this immunity by invoking § 815.2. Section 815.2 'does not apply in the case of injuries to prisoners.'" *Colbert*, 2026 WL 931542, at *5 (citations omitted). Thus, Plaintiffs fail to plead any cognizable claims of dangerous conditions of public property and premises liability.

**F. Declaratory Relief**

"The Ninth Circuit has directed district courts faced with whether to entertain claims for declaratory relief to consider, among other factors, whether the claim will settle all aspects of the controversy or serve some other useful purpose." *Top Agent Network, Inc. v. Zillow, Inc.*, No. 14-cv-04769-RS, 2015 WL 7709655, at *9 (N.D. Cal. Apr. 13, 2015) (citing *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998)).

Here, Plaintiffs set forth no independent useful purpose in their claim for declaratory relief that would not otherwise necessarily be answered upon adjudication of the other claims in the action. Plaintiffs assert that their allegations concerning inadequate training and supervision consist of ongoing risks for inmates in the custody of Defendants. *See* (Docs. 42 at 24; 48 at 13; 49 at 19-20; 55 at 19-20). However, the rights of the Plaintiffs, the obligations of the Defendants, and the

legal relations between the parties will be necessarily clarified upon adjudication of the claims brought pursuant to section 1983 and under state law, and regarding Plaintiffs' *Monell* allegations, assuming Plaintiffs can plead cognizable claims therefor. Thus, the claims for declaratory relief will be dismissed as to all Defendants. *See United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985) ("Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties.").

### G. Leave to Amend

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "should be freely granted when justice so requires" as the purpose of the Rule is "to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). However, courts may, in their discretion, choose to decline leave to amend due to futility, bad faith, undue delay, prejudice to the opposing parties, dilatory motive or conduct, or a repeated failure to cure deficiencies by amendments. *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–893 (9th Cir. 2010). A court's discretion in denying leave to amend is particularly broad after a plaintiff has already been afforded an opportunity to amend the complaint. *See Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016).

Here, Plaintiffs request leave to amend if any portion of Defendants' motion is granted. (Docs. 42 at 24-25; 48 at 14; 49 at 20; 55 at 20). The Court finds that the above deficiencies may be remedied by amendment and will extend leave to amend.

## IV. <u>Conclusion and Order</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1. The County Defendants' motions to dismiss (Doc. 39, 45, 54) are GRANTED;
2. The Hospital Defendants' motion to dismiss (Doc. 47) is GRANTED;
3. All claims in the first amended complaint (Doc. 31) are DISMISSED without prejudice;
4. Plaintiffs are GRANTED leave to amend the complaint;
5. Within 21 days of entry of this order, Plaintiffs SHALL file any second amended complaint; and

6. Defendants SHALL file their response to any second amended complaint within 14 days of service of the second amended complaint. *See* Fed. R. Civ. P. 15(a)(3).

IT IS SO ORDERED.

Dated: **August 4, 2026**

UNITED STATES MAGISTRATE JUDGE